STATE v. BALLANCE

[218 N.C. App. 202 (2012)]

STATE OF NORTH CAROLINA v. TANYA LAINE BALLANCE, FRANK PASCAL
BALLANCE, and RICHARD A. SWAIN

No. COA11-620

(Filed 17 January 2012)

**1. Animals—bear baiting—type of feed—one offense**

The trial court did not err by failing to dismiss misdemeanor statements of charges arising from bear baiting where defendant argued that N.C.G.S. § 113-291.1(b)(2) set out eight separate offenses, depending upon the type of bait used, so that the statements of charges had to indicate which of the separate offenses the co-defendant had violated. However, the criminal pleadings in this case tracked the language of the statute, which did not create a separate offense for each type of listed bait.

**2. Search and Seizure—bear baiting evidence—entry into open field**

The trial court did not err in a bear baiting case by denying defendants' motion to suppress evidence that investigating officers obtained upon entering defendant Frank Balance's property without permission or a warrant. In light of the undisputed evidence reflected in the court's findings, the property in question constituted an "open field," so that the officers' entry and their observations did not constitute a search for Fourth Amendment purposes.

**3. Evidence—harmless error—overwhelming evidence of guilt**

Any error the trial court may have made in a bear baiting case by allowing the admission of photographs, videotapes, and physical evidence was harmless beyond a reasonable doubt in light of the overwhelming evidence of guilt.

**4. Animals—bear baiting—sufficiency of evidence—intent to violate law not required**

The trial court did not err in a bear baiting case by denying defendant's motion to dismiss for insufficiency of the evidence. Although defendants argued that they must have acted knowingly and with a conscious intent to violate the law, the relevant statutory language does not include wording suggesting that the existence of any particular mental state is an essential element of the offense.

**5. Constitutional Law—effective assistance of counsel— co-defendant's statements about defendant's guilt—no impact on trial**

Trial counsel in a bear baiting case did not provide deficient representation to defendant Swain by failing to obtain a severance of the trial or by not objecting to the testimony during trial, ensuring that a codefendant's statements concerning Swain's guilt not be considered by the jury. There was ample evidence of defendant Swain's guilt.

**6. Evidence—photographs and physical evidence—no material effect on trial**

Given defendant Swain's admissions and an officer's testimony about his observations of Mr. Swain, any error in the admission of photographs, videotapes, and processed food items in a bear baiting case did not have any material effect on the trial.

Appeal by defendants from judgments entered 1 October 2010 by Judge Wayland J. Sermons in Hyde County Superior Court. Heard in the Court of Appeals 7 November 2011.

*Attorney General Roy Cooper, by Assistant Attorney General C. Norman Young, Jr., for the State.*

*Paul F. Herzog for Defendant Richard A. Swain.*

*McLean Law Firm, P.A., by Russell L. McLean, III, for Defendants Tanya Laine Ballance and Frank Pascal Ballance.*

ERVIN, Judge.

Defendants Frank Pascal Ballance, Tanya Laine Ballance[1], and Richard A. Swain appeal from judgments imposing a 45 day suspended sentence upon Ms. Ballance based upon her conviction for taking a bear with the aid of bait, imposing a 45 day suspended sentence upon Mr. Ballance based upon his conviction for aiding and abetting Ms. Ballance in taking a bear with the aid of bait, and imposing a 45 day suspended sentence upon Mr. Swain based upon his convictions for taking a bear with the aid of bait and placing processed food as bait in an area designated for bear hunting. On appeal, all three Defendants argue that the trial court erred by denying their motion to suppress evidence seized from Mr. Ballance's

1. Tanya Ballance is the daughter of Frank Ballance.

property. In addition, Mr. and Ms. Ballance argue that the trial court erred by failing to dismiss the misdemeanor statements of charges that had been filed against them and denying their dismissal motions. Finally, Mr. Swain argues that he received ineffective assistance of counsel because his trial counsel failed to seek to have his trial severed from that of Ms. Ballance or to object to the admission of certain statements that Ms. Ballance made to investigating officers. After careful consideration of Defendants' challenges to the trial court's judgments in light of the record and the applicable law, we conclude that Defendants are not entitled to any relief on appeal.

## I.  Factual Background

### A.  Substantive Facts

#### 1.  State's Evidence

On 22 September 2008, North Carolina Wildlife Officers Robert Wayne and David Woods entered a tract of swampy and wooded property owned by Mr. Ballance that contained more than 100 acres. At a location near an old logging road that ran through the property, Officer Wayne discovered two barrels that had been chained to trees, one of which was a green barrel that contained corn and the other of which was a black barrel that contained sliced bread, and a "metal case made for a trail camera" that had also been chained to a tree. Having seen similar sights on "hundreds" of prior occasions, Officer Woods associated the use of such barrels with efforts to attract bears. In addition, Officer Wayne observed bear excrement near the barrels, game trails that appeared to have been made by bears, and claw marks on the trees.

On 25 September, Officers Wayne and Woods returned to the barrel site, where they observed additional food items that had not been present on 22 September, including watermelon, cantaloupe, pine apple, strawberries, "suckers, some princess snacks, ring pops, cheddar cheese nab crackers, raisins, Starburst fruit-flavored snacks, and Peeps." On 1 October, Officer Wayne returned to the barrel site with Officer Woods and North Carolina Wildlife Officer Parks Moss. At that time, some of the food items that Officers Wayne and Woods had previously observed were still present. In addition, Officer Wayne saw spent shotgun shells near the tree to which the green barrel had been attached[2] and indications that nearby limbs and vegetation had been cut.

---

2. Mr. Swain subsequently told Officer Wayne that the shotgun shells had been left when he shot holes into a barrel to facilitate chaining it to a tree.

When Officer Wayne returned to the barrel site on 7 October, he noticed fresh corn in the green barrel and a camera in the box chained to a tree. At about 9:30 p.m. on 9 October, Officers Wayne and Woods came to the barrel site and saw fresh corn in the green barrel, chocolate frosting near a box that had contained a commercially-prepared chocolate cake, and evidence of heavy black bear activity. The camera that had been inside the metal box was no longer there.

On 10 and 11 October, Officer Woods made video recordings of his observations at the site. Officer Woods noted that the ground near the barrels had been trampled on or matted down and that a lot of "bear scat" was present. On the second of these two dates, Officer Woods videotaped a bear eating from the green barrel. Several hours later, Officer Woods saw Mr. Ballance unload a deer carcass at the site and place it "right at the base of the barrel."

On 18 October, Officers Wayne and Woods encountered Defendants in Mr. Ballance's truck. At that time, Defendants told Officer Wayne that they had been hunting deer. Both officers saw a deer in the bed of Mr. Ballance's truck. On 24 October, Officers Wayne and Woods observed deer carcasses at the barrel site and "deer meat cut up and placed on top of the corn in the barrel."

Officer Woods returned to the barrel site on 28 and 30 October. On 28 October, Officer Woods "discovered an orange barrel with what appeared to be old corn inside the barrel and on the ground," "a white five-gallon bucket that had blood streaks inside the bucket itself," and "several deer carcasses and deer parts around the vicinity of the barrel." Branches had been cut from nearby trees so as to afford a clear view of the barrels from a nearby vantage point. On 30 October, Officer Woods saw Mr. Swain and Ms. Ballance driving slowly past the area in a truck with barrels in the bed.

Officer Woods next visited the barrel site on 3 November. At that time, Officer Woods saw a new orange barrel that contained blood and grains of corn. As Officer Woods observed the site, Mr. Swain arrived with a package of Oreo cookies and other processed food items. Mr. Swain distributed the cookies and other items near the barrels, filled a barrel with corn, picked up the orange barrel that contained blood and corn, and drove away. After Mr. Swain's departure, Officer Woods collected various items from the site, including sugar cookies and Halloween candy that Mr. Swain had deposited at the site. On 9 November, Officer Woods "found Apple Jacks cereal, taco shells, both soft and hard shell tacos, and zebra cakes actually inside the barrel mixed in with the corn" at the site.

On 10 November, the opening day of bear-hunting season, Officer Woods went to the barrel site at around 4:00 p.m. At that time, he saw Mr. Swain "wearing a reddish orange color shirt, camouflage pants, and blaze orange hat" and Ms. Ballance wearing "a light camouflage pattern shirt, blue jeans, [and] blaze orange hat." Both Mr. Swain and Ms. Ballance were carrying firearms. After their departure, Officer Woods observed sugary cereal mixed with corn in one of the barrels.

At around 3:30 p.m. on 11 November, Officer Woods saw Mr. Swain's truck drive by the barrel site. A few minutes later, Mr. Swain and Ms. Ballance walked past, accompanied by a young child. Both Mr. Swain and Ms. Ballance were carrying rifles and wearing the same camouflaged clothing that they had worn on the preceding day. Mr. Swain, Ms. Ballance, and the child sat down about 20 yards from the barrels in the vicinity of the area in which the tree limbs had been cut.

Just before 5:00 p.m., Officer Woods heard a rifle shot from the direction of the barrels, followed by the noise of a bear running away from the barrel site. Up until that point, Officer Woods had not seen or heard any indication of the presence of dogs. About fifteen minutes later, Mr. Ballance came to the vicinity of the barrels with a dog on a leash. At that point, Officer Woods informed Ms. Ballance and Mr. Ballance of his presence. Ms. Ballance told Officer Woods that "she'd shot at the bear, that she missed it, and they got the dogs out to try and find it." At another point, Ms. Ballance stated that she did not know whether she had hit the bear when she shot at it.

After learning that a shot had been fired near the barrel site, Officer Wayne came to the entrance to Mr. Ballance's property. At the time of his arrival, which occurred at about dusk, he saw Mr. Swain talking to Officer Moss. Mr. Swain told the investigating officers that "they" had shot a deer back in the Ballance woods; however, he did not identify his companions at that time.

Officer Wayne rode with Mr. Swain to the barrel site, where he saw Officer Woods, Mr. Ballance, Ms. Ballance, and a child. At that point, Mr. Ballance admitted having placed two deer carcasses near the barrels and said that, after Ms. Ballance shot at the bear, he brought one of his "bear dogs" to the trail and unsuccessfully attempted to track it. Similarly, Ms. Ballance acknowledged having been present when deer carcasses were left at the barrel site and that she had been with Mr. Swain when food was left there. However, Ms. Ballance did not recall what type of food had been left at the barrel site on those occasions. Ms. Ballance also admitted that she had been

at the barrel site with Mr. Swain and a child earlier that day and that, when a bear appeared, she had urged the child to shoot the bear. However, since the child was unable to shoot the bear, it began to walk away. At that point, Mr. Swain whistled at the bear and Ms. Ballance shot at it with a rifle. However, Ms. Ballance did not know whether she had hit the bear.

### 2. Defendant's Evidence

#### a. Testimony of Mr. Ballance

Mr. Ballance testified that he had owned the property on which the barrels were located for about thirty-five years. Although he generally used the property for hunting, "from time to time people would have a freezer go bad or a refrigerator go bad and they had some food or something that they needed to get rid of, carry it up yonder and dump it out." Since his trash was only collected once a week, if an item "was going to get smelly, [he'd] take it up to the property and discard . . . it." Mr. Ballance had dumped deer carcasses at the barrel site on prior occasions and admitted having done so on 11 October 2008. In addition, Mr. Ballance acknowledged that he had driven onto his property just behind Mr. Swain and Ms. Balance on 11 November 2008 and that, after doing so, he had stopped and waited. At around 5:00 p.m., Mr. Ballance had received a phone call from Ms. Ballance in which "[t]hey called [him] to try to help them find the bear." As a result, Mr. Ballance drove to the barrel site, "took [his] dog[,] and went out through the woods in the direction that they felt like the bear may have gone."

#### b. Testimony of Mr. Swain

Mr. Swain testified that he had used Mr. Ballance's property to "[d]ump garbage" and that, if "a refrigerator went to the bad, [or] a freezer went to the bad, [he] dumped all of that stuff out of there." Mr. Swain admitted having dumped Easter candy at the barrel site on one occasion and having dumped spoiled food there in June or July, 2008. In addition, Ms. Ballance had dumped deer carcasses at the barrel site. Between July and November, 2008, Mr. Swain had left corn at the barrel site as well. Mr. Swain had been at the barrel site on 3 November 2008 and had put corn in the barrels on that occasion. However, he denied having left candy or other processed food items at the barrel site at that time.

Mr. Swain and Ms. Ballance were in the area of the barrel site on 10 November for the purpose of assessing hunting prospects. At that

**STATE v. BALLANCE**

[218 N.C. App. 202 (2012)]

time, they saw four bears. On the following day, Mr. Swain and Ms. Ballance went to Mr. Ballance's property along with Ms. Ballance's six year old son, who wanted to shoot a bear. Although a bear came within ten or fifteen yards of their location, the boy was unable to fire the rifle. "He said he couldn't [shoot], so as it come on up and . . . it turned and started walking towards the truck, so as it turned to the truck, [Ms. Ballance] shot." The bear was about forty or fifty yards from the barrels when Ms. Ballance shot at it. At that point, Ms. Ballance called her father, who arrived shortly thereafter.

Subsequently, Mr. Ballance and Mr. Swain searched for the bear:

> From that point, we went—took [Mr. Ballance's] dog, went back into the woods. We walked-. . . there's a swamp run right here. You can see where the territory actually changes . . . and from that point we walked the edge of that trying to find something. We didn't ever find nothing, and then we walked back to the path where the bear actually made its turn and went back in the woods and then from that point I told him, I said, "Well, I'll just go to the house[.]"

After their unsuccessful search for the bear, Mr. Swain began to drive out of Mr. Ballance's property. As he did so, Officer Moss stopped Mr. Swain and asked what he had been doing. Although he acknowledged that he had told Officer Moss that he had shot a deer, Mr. Swain admitted on cross-examination that this statement was not true. In addition, Mr. Swain admitted that he had put corn out at the barrel site on 3 November, that he and Ms. Ballance had shot several deer during October 2008, that Ms. Ballance had disposed of one or more deer carcasses at the barrel site, and that he had erected a trail camera at the barrel site.

### 3. State's Rebuttal Evidence

On 11 November 2008, Officer Moss was assigned "to work the site that Officer Wayne and Officer Woods had located for a possible bear bait." Officer Moss hid near the entrance to Mr. Ballance's property, which was blocked by a cable. At approximately 3:30 p.m., he heard two vehicles stop at the cable, then heard someone lower the cable, and both vehicles drove onto the property. After entering Mr. Ballance's property, one truck drove into the interior of the property while the other waited near the gate. After hearing a shot fired at about 5:00 p.m., Officer Moss "heard the truck crank up and drive further into the property." Shortly thereafter, Mr. Swain's truck approached the gate, so Officer Moss revealed himself. At that point,

Mr. Swain told Officer Moss that he had just shot a deer and that his companions were looking for it. After speaking with Mr. Swain, Officer Moss drove farther onto the property and spoke to Ms. Ballance, who told him that she had just shot at a bear. Officer Moss saw the remains of several animals at the barrel site later that night.

## B. Procedural History

On 11 November 2008, citations were issued charging all three Defendants with placing processed food as bait in an area where there is an open season for hunting black bear in violation of N.C. Gen. Stat. § 113-294(r), charging Ms. Ballance and Mr. Swain with unlawfully taking a black bear with the aid of bait in violation of N.C. Gen. Stat. § 113-294(c1), and charging Mr. Ballance with aiding Ms. Ballance in taking a black bear with the aid of bait in violation of N.C. Gen. Stat. § 113-294(c1). In the Hyde County District Court proceedings, misdemeanor statements of charges were filed charging (1) Ms. Ballance with placing processed food as bait in an area where there is an open season for hunting black bear in violation of N.C. Gen. Stat. § 113-294(r) and taking a black bear with the aid of bait in violation of N.C. Gen. Stat. § 133-291.1(b)(2); (2) Mr. Ballance with aiding and abetting Ms. Ballance in taking a black bear with the aid of bait in violation of N.C. Gen. Stat. § 113-291.1(b)(2) and placing processed food as bait in an area where there is an open season for hunting black bear in violation of N.C. Gen. Stat. § 113-294(r); and (3) Mr. Swain with taking a black bear with the aid of bait in violation of N.C. Gen. Stat. § 113-291.1(b)(2) and placing processed food as bait in an area where there is an open season for hunting black bear in violation of N.C. Gen. Stat. § 113-294(r).[3] On 25 November 2009, all three Defendants were convicted as charged in the Hyde County District Court. Each Defendant noted an appeal to the Hyde County Superior Court from the District Court judgments.

On 21 September 2010, Defendants filed a motion seeking the suppression of "all evidence seized or discovered" on Mr. Ballance's property. After a hearing held prior to the beginning of the trial, the trial court orally denied Defendants' motion. On 6 January 2011, the trial court entered a written order denying Defendants' suppression motion.

---

3. The District Court misdemeanor statements of charges are not contained in the record on appeal. However, counsel for the State and Defendants appeared to agree at the beginning of the Superior Court proceedings that the District Court misdemeanor statements of charges were identical to the Superior Court misdemeanor statements of charges discussed later in this opinion except for the clarification of a date-related issue.

The charges against Defendants came on for trial before the trial court and a jury at the 27 September 2010 Criminal Session of Hyde County Superior Court. On 27 September 2010, superseding misdemeanor statements of charges were filed charging (1) Ms. Ballance with placing processed food as bait in an area where there is an open season for hunting black bear in violation of N.C. Gen. Stat. § 113-294(r) and unlawfully taking a black bear with the aid of bait in violation of N.C. Gen. Stat. § 113-294(b)(2); (2) Mr. Ballance with aiding and abetting Ms. Ballance's unlawful taking of a black bear with the aid of bait in violation of N.C. Gen. Stat. § 113-294(b)(2) and placing processed food as bait in an area where there is an open season for hunting black bear in violation of N.C. Gen. Stat. § 113-294(r); and (3) Mr. Swain with placing processed food as bait in an area where there is an open season for hunting black bear in violation of N.C. Gen. Stat. § 113-294(r) and unlawfully taking a black bear with the aid of bait in violation of N.C. Gen. Stat. § 113-291.1(b)(2). At trial, the trial court granted Defendants' motion to dismiss the instruments charging Ms. Ballance and Mr. Ballance with placing processed food as bait in an area in which there is an open season for hunting black bear in violation of N.C. Gen. Stat. § 113-294(r). At the conclusion of the trial, the jury returned verdicts convicting Ms. Ballance of taking a black bear with the aid of bait in violation of N.C. Gen. Stat. § 113-291.1(b(2), convicting Mr. Ballance of aiding and abetting Ms. Ballance in the taking a black bear with the aid of bait in violation of N.C. Gen. Stat. § 113-291.1(b)(2), and convicting Mr. Swain of taking a black bear with the aid of bait in violation of N.C. Gen. Stat. § 113-291.1(b)(2) and with placing processed food as bait in an area in there is an open season for hunting black bear in violation of N.C. Gen. Stat. § 113-294(r). After accepting the jury's verdicts, the trial court sentenced all three Defendants to 45 days imprisonment, suspended each sentence, and placed Defendants on unsupervised probation for a period of 18 months, subject to certain terms and conditions. Defendants noted an appeal to this Court from the trial court's judgments.

## II. Legal Analysis

### A. Nature of Charged Offenses

As a preliminary matter, it would be helpful to review the nature of the offenses with which Defendants were charged. Mr. Swain was convicted of violating N.C. Gen. Stat. § 113-294(r), which provides that:

> It is unlawful to place processed food products as bait in any area of the State where the Wildlife Resources Commission

has set an open season for taking black bears. For purposes of this subsection, the term "processed food products" means any food substance or flavoring that has been modified from its raw components by the addition of ingredients or by treatment to modify its chemical composition or form or to enhance its aroma or taste. The term includes substances modified by sugar, honey, syrups, oils, salts, spices, peanut butter, grease, meat, bones, or blood, as well as extracts of such substances. The term also includes sugary products such as candies, pastries, gums, and sugar blocks, as well as extracts of such products. . . .

In addition, all three Defendants were convicted of violating N.C. Gen. Stat. § 113-291.1(b)(2), which provides, in pertinent part, that "[n]o black bear may be taken with the use or aid of any salt, salt lick, grain, fruit, honey, sugar-based material, animal parts or products, or other bait[.]" According to N.C. Gen. Stat. § 113-130(7), the term "take," when used in the wildlife context, includes "[a]ll operations during, immediately preparatory, and immediately subsequent to an attempt, whether successful or not, to capture, kill, pursue, hunt, or otherwise harm or reduce to possession" a bear. As a result, in order to convict a defendant of violating N.C. Gen. Stat. § 113-291.1(b)(2), the State must prove that the defendant:

1. Performed or engaged in an operation "during, immediately preparatory, and immediately subsequent to an attempt, whether successful or not, to capture, kill, pursue, hunt, or otherwise harm or reduce to possession" a bear, and that

2. The taking was "with the use or aid of any salt, salt lick, grain, fruit, honey, sugar-based material, animal parts or products, or other bait[.]"

### B.  Appeal by Ms. Ballance and Mr. Ballance

### 1.  Misdemeanor Statement of Charges

[1] In their initial challenge to the trial court's judgments, Mr. Ballance and Ms. Ballance argue that the trial court erred by failing to dismiss the misdemeanor statements of charges that had been filed against them for the purpose of alleging a violation of N.C. Gen. Stat. § 113-291.1(b)(2) on the grounds that these criminal pleadings were "fatally defective." We disagree.

N.C. Gen. Stat. § 15A-924(a)(5) provides that "a criminal pleading must contain:"

 (5) A plain and concise factual statement in each count which, without allegations of an evidentiary nature, asserts facts supporting every element of a criminal offense and the defendant's commission thereof with sufficient precision clearly to apprise the defendant or defendants of the conduct which is the subject of the accusation. . . .

The misdemeanor statement of charges alleging that Ms. Ballance violated N.C. Gen. Stat. § 113-291.1(b)(2) states that, "on or about November 11, 2008 and in the county named above, the defendant named above unlawfully, willfully did take a big game animal, black bear, with the use and aid of animal parts or other bait." Similarly, the misdemeanor statement of charges charging Mr. Ballance with aiding and abetting a violation of N.C. Gen. Stat. § 113-291.1(b)(2) alleges that, "on or about November 11, 2008 and in the county named above, the defendant named above unlawfully, willfully did aid and abet [Ms. Ballance] in the taking of a big game animal, black bear, with the use and aid of animal parts or other bait." Since both criminal pleadings track the language of N.C. Gen. Stat. § 113-291.1(b)(2), *State v. Singleton*, 85 N.C. App. 123, 126, 354 S.E.2d 259, 262 (stating that "[a]n indictment couched in the language of the statute is generally sufficient to charge the statutory offense") (citing *State v. Palmer*, 293 N.C. 633, 637, 239 N.C. 406, 409 (1977), *disc. review denied*, 320 N.C. 516, 358 S.E.2d 530 (1987), we conclude that they sufficiently charge the commission of a criminal offense and are not "fatally defective."

 In seeking to persuade us to reach a contrary conclusion, Defendants note that N.C. Gen. Stat. § 113-291.1(b)(2) provides that no black bear may be taken "with the use or aid of any salt, salt lick, grain, fruit, honey, sugar-based material, animal parts or products, or other bait" and claim that "[e]ach of these items if used is a separate offense." In other words, Defendants contend, in reliance upon *State v. Madry*, 140 N.C. App. 600, 537 S.E.2d 827 (2000), that N.C. Gen. Stat. § 113-291.1(b)(2) sets out eight separate offenses which differ based solely upon the specific type of bait allegedly utilized by the defendant to take a bear. We do not find this argument persuasive.

 The defendant in *Madry* was charged with violating N.C. Gen. Stat. § 113-294(c1) under an aiding and abetting theory based upon a warrant alleging that he "unlawfully, willfully did aid and abet Richard G. McCormack by taking bear with use and aid of bait." *Madry*, 140 N.C. App at 601, 537 S.E.2d at 828. Although the warrant in question specified the manner in which the defendant allegedly aided and abetted his co-defendant, it failed to identify the offense

committed by that co-defendant. N.C. Gen. Stat. § 113-294(c1) makes it unlawful to "take[], possess[], transport[], sell[], possess[] for sale, or buy[] any bear or bear part" and specifies that "[e]ach of the acts specified shall constitute a separate offense." Thus, in order to properly charge the defendant with aiding and abetting a violation of N.C. Gen. Stat. § 113-294(c1), the warrant had to indicate which of these separate offenses the co-defendant had committed.

N.C. Gen. Stat. § 113-291.1(b)(2) does not, however, create a "separate offense" for each and every type of bait listed in the relevant statutory language. Instead, " 'a single wrong [may be] established by a finding of various alternative elements," since "[t]he crime of [taking a bear with the use or aid of bait] is a single offense which may be proved by evidence of the commission of any one of a number of acts.' " *State v. Jones*, 172 N.C. App. 308, 315, 616 S.E.2d 15, 20 (2005) (quoting *State v. Hartness*, 326 N.C. 561, 566-67, 391 S.E.2d 177, 180 (1990)) (discussing the offense of taking indecent liberties with a child). Having rejected the contention that N.C. Gen. Stat. § 113-291.1(b)(2) creates a separate offense for each type of bait allegedly used by the defendant, there is no basis for concluding that the criminal pleadings filed against Ms. Ballance and Mr. Ballance should have been dismissed.

## 2. Suppression Motion

[2] The record clearly establishes that, on several occasions between 22 September and 11 November 2008, investigating officers entered Mr. Ballance's property without obtaining either Mr. Ballance's permission or the issuance of a search warrant. At trial, these officers testified concerning the observations that they made during their investigation and identified photographs, videotapes, and items of food that had been taken from the barrel site. On appeal, Ms. Ballance and Mr. Ballance argue that the trial court erred by denying their motion to suppress the evidence that investigating officers obtained as the result of their entry onto Mr. Ballance's property on the grounds that this evidence had been obtained as a result of a violation of their federal and state right to be free from unreasonable searches and seizures. Defendant's argument lacks merit.

"The Fourth Amendment to the United States Constitution protects the 'right of the people to be secure [in their persons, houses, papers, and effects,] against unreasonable searches and seizures.' U.S. Const. amend. IV. . . . Article I, Section 20 of the North Carolina Constitution provides similar protection against unreasonable

seizures." *State v. Campbell*, 359 N.C. 644, 659, 617 S.E.2d 1, 11 (2005) (citing *State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 69 (1994)), *cert. denied*, 547 U.S. 1073, 126 S. Ct. 1773, 164 L. Ed. 2d 523 (2006). "Before resorting to the rules of search and seizure, it must first be determined whether the conduct complained of was within the sphere of Fourth Amendment protection. . . . '[C]apacity to claim the protection of the [Fourth] Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion.' " *State v. Boone*, 293 N.C. 702, 708, 239 S.E.2d 459, 463 (1977) (quoting *Mancusi v. DeForte*, 392 U.S. 364, 368, 88 S. Ct. 2120, 2134-24, 20 L. Ed. 2d 1154, 1159 (1968)). The "special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields." *Hester v. United States*, 265 U.S. 57, 59, 44 S. Ct. 445, 446, 68 L. Ed. 898, 900 (1924).

> [T]he term "open fields" may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither "open" nor a "field" as those terms are used in common speech. For example, . . . a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment. . . . [A]n individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers. . . . Nor is the government's intrusion upon an open field a "search" in the constitutional sense because that intrusion is a trespass at common law.

*Oliver v. United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 1742, 80 L. Ed. 2d 214, (1984) (citations omitted).

As a result of the fact that Defendants have not challenged the sufficiency of the evidence to support the trial court's findings, those findings "are deemed to be supported by competent evidence and are binding on appeal." *State v. Biber*, 365 N.C. 162, 167-68, 712 S.E.2d 874, 878 (2011) (citation omitted). Among other things, the trial court found that:

> 5. The Ballance Land has previously been hunted upon by Defendant Ballance and others.

> 6. That the land consists of nearly 119 acres of wooded land . . . .

> 7. That Defendant, Frank Bal[l]ance's residence is four to five miles from the Ballance Land.

. . . .

28. There are no buildings or residences contained on this tract of land known as the Ballance Land.

29. Residential activities of any type do not take place upon this tract of land known as the Ballance Land.

30. That Hunting is the only activity that takes place upon this property other than the growing of trees.

In light of the undisputed evidence reflected in the trial court's findings, we conclude that the property in question constituted an "open field," so that the investigating officers' entry onto the property and the observations that they made while they were there did not constitute a "search" for Fourth Amendment purposes. *Hester*, 265 U.S. at 59, 44 S. Ct. at 446, 68 L. Ed. at 900[4] Although Mr. Ballance and Ms. Ballance urge us to reach a contrary conclusion on the grounds that, given the size, extent, and condition of Mr. Ballance's property, they had a legitimate expectation of privacy with respect to the tract's interior, the factors upon which they rely do not obviate the fact that the tract in question is, for purposes of "search and seizure" law, an "open field." As a result, the trial court properly rejected Defendants' challenge to the testimony of the investigating officers concerning the observations that they made while on Mr. Ballance's property during the course of their investigation.

[3] In addition, Ms. Ballance and Mr. Ballance challenge the taking of various photographs, the making of various videotapes, and the seizure of various items of physical evidence from the property on the grounds that this action violated their rights not to be subjected to unreasonable searches and seizures as guaranteed by the United States and North Carolina Constitutions. In support of this contention, Ms. Ballance and Mr. Ballance rely upon our decision in *State v. Nance*, 149 N.C. App. 734, 562 S.E.2d 557 (2002), in which we held invalid the seizure of certain emaciated horses on the grounds that, even though investigating officers had the right to make the observations that led to the seizure, they had no authority to enter onto the defendant's property for the purpose of seizing those horses. We conclude, however, that we need not decide whether the illustrative

---

4. In view of our conclusion that the property in question constituted an "open field" for Fourth Amendment purposes, we need not address (1) the scope of a Wildlife Officer's statutory authority to come on the property in question or (2) the extent to which Ms. Ballance or Mr. Swain had a standing to challenge a search conducted on Mr. Ballance's property.

and physical evidence that Ms. Ballance and Mr. Ballance sought to have excluded was unlawfully obtained because any error that the trial court may have committed in denying their suppression motion with respect to this evidence was harmless beyond a reasonable doubt given the overwhelming evidence of their guilt. N.C. Gen. Stat. § 15A-1443(b) (providing that "[a] violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt" and that "[t]he burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless"). "An error is harmless beyond a reasonable doubt if it did not contribute to the defendant's conviction." *State v. Nelson*, 341 N.C. 695, 701, 462 S.E.2d 225, 228 (1995).

A number of law enforcement officers testified that deer carcasses, animal parts, and processed foods were seen at the barrel site either separately or mixed with corn on numerous occasions between 22 September and 11 November 2008. In addition, both Ms. Ballance and Mr. Ballance made statements in in which they essentially admitted that they had unlawfully taken a bear. For example, Ms. Ballance admitted having left at least one deer carcass at the barrel site and having shot at a bear in the vicinity of the barrels on 11 November 2008. Similarly, Mr. Ballance admitted that he owned the property on which deer carcasses, corn, and processed food were found; that the land was used for hunting and refuse disposal, including the disposal of household garbage and deer carcasses; that he left a deer carcass at the barrel site on 11 October 2008; that he permitted Ms. Ballance and Mr. Swain to hunt on his property; that he entered his property on 11 November 2008 at the same time as Mr. Swain and Ms. Ballance; that Ms. Ballance called him after she shot at a bear; and that, after receiving this call, he took a hunting dog and attempted to track the bear. As a result, the evidence of Ms. Ballance's and Mr. Ballance's guilt was overwhelming, so that any error that the trial court may have committed by allowing the admission of the challenged photographs, videotapes, and items of physical evidence was harmless beyond a reasonable doubt.

### 3. Sufficiency of the Evidence

[4] In their next challenge to the trial court's judgments, Ms. Ballance and Mr. Ballance argue that the trial court erroneously denied their motions to dismiss for insufficiency of the evidence. We do not find their arguments persuasive.

STATE v. BALLANCE

[218 N.C. App. 202 (2012)]

As we have already noted, the State presented extensive evidence tending to show that (1) processed food, deer carcasses and parts, and corn were present at the barrel site; (2) Ms. Ballance shot at a bear in the vicinity of the barrel site on 11 November 2008; and (3), after this shot was fired, Mr. Ballance attempted to track the animal down. As we understand the relevant statutory language, the act of shooting at a bear near a location at which processed food items have been set out or of attempting to track a bear under the circumstances at issue here amounts to the unlawful "taking" of a bear "with the use or aid" of bait. Thus, we conclude that the trial court did not err by denying Defendants' dismissal motions.

In urging us to reach a different result, Defendants contend that, in order to establish a violation of N.C. Gen. Stat. § 113-291.1(b)(2), the State must elicit evidence tending to show that Mr. Ballance and Ms. Ballance acted "knowingly" and with a conscious intent to violate the law. Based upon this logic, Ms. Ballance and Mr. Ballance argue that they could not have been lawfully convicted of taking a bear with the aid of bait in the absence of evidence tending to show that they were aware of the specific contents of the barrels on 11 November 2008. We disagree.

"As a matter of both State and federal constitutional law, legislatures may make the doing of an act a criminal offense even in the absence of criminal intent." *State v. Smith*, 90 N.C. App. 161, 163, 368 S.E.2d 33, 35 (1988) (citing *United States v. Balint*, 258 U.S. 250, 252, 42 S. Ct. 301, 302, 66 L. Ed. 604, 605 (1922) (stating that "the State may in the maintenance of a public policy provide 'that he who shall do them shall do them at his peril and will not be heard to plead in defense good faith or ignorance'") (internal citation omitted), and *State v. Hales*, 256 N.C. 27, 30, 122 S.E. 2d 768, 771 (1961)), *aff'd*, 323 N.C. 703, 374 S.E.2d 866 (1989), *cert. denied*, 490 U.S. 1100, 109 S. Ct. 2453, 104 L.Ed.2d 1007 (1989). Simply put, "[i]t is within the power of the Legislature to declare an act criminal irrespective of the intent of the doer of the act. The doing of the act expressly inhibited by the statute constitutes the crime. Whether a criminal intent is a necessary element of a statutory offense is a matter of construction to be determined from the language of the statute in view of its manifest purpose and design." *Hales*, 256 N.C. at 30, 122 S.E. 2d at 771.

The position espoused by Ms. Ballance and Mr. Ballance rests on the assumption that "knowing" or "willful" action is an essential element of the offense specified in N.C. Gen. Stat. § 113-291.1(b)(2). The relevant statutory language simply does not include any wording

suggesting that the existence of any particular mental state is an essential element of the offense in question. For example, the statute does not require that the defendant act "willfully," "intentionally," "knowingly," or "purposefully." A careful examination of the brief submitted to this Court on behalf of Ms. Ballance and Mr. Ballance indicates that they have not cited any authority in support of their position with respect to this issue, and we have not discovered any such authority during the course of our own research. As a result, since "[t]he plain terms of [N.C. Gen. Stat. § 113-291.1(b)(2)] do not include any reference to criminal intent or *mens rea*," *State v. Haskins*, 160 N.C. App. 349, 352, 585 S.E.2d 766, 768, *disc. review denied*, 357 N.C. 580, 589 S.E.2d 356 (2003); *see also, e.g.*, *State v. Bryant*, 359 N.C. 554, 562, 614 S.E.2d 479, 484 (2005) (holding that an amendment to the sex offender registration statute "deleting the statutory *mens rea* requirement, which penalized only those offenders 'who, knowingly and with the intent to violate'" statute, demonstrated that "the General Assembly clearly expressed its intent to make failure to register as a sex offender a strict liability offense"), the offense of taking a bear with the aid of bait in violation of N.C. Gen. Stat. § 113-291.1(b)(2) does not require proof that the defendant possessed any particular mental state, including proof that he or she knew that impermissible bait had been placed at a particular location on a particular date. Thus, the trial court did not err by refusing to dismiss the taking a bear with the aid of bait charges lodged against Ms. Ballance and Mr. Ballance.

### C. Appeal of Richard Swain

### 1. Ineffective Assistance of Counsel

[5] Initially, Mr. Swain contends that his trial counsel provided him with deficient representation by failing to seek to have his case severed from that of Ms. Ballance and failing to object to the admission of the statements that Ms. Ballance made to investigating officers. We disagree.

> To successfully assert an ineffective assistance of counsel claim, defendant must satisfy a two-prong test. First, he must show that counsel's performance fell below an objective standard of reasonableness. Second, once defendant satisfies the first prong, he must show that the error committed was so serious that a reasonable probability exists that the trial result would have been different absent the error.

*State v. Blakeney,* 352 N.C. 287, 307-08, 531 S.E.2d 799, 814-15 (2000) (internal citation omitted), *cert. denied,* 531 U.S. 1117, 121 S. Ct. 868, 148 L. Ed. 2d 780 (2001). The essential thrust of the ineffective assistance of counsel claims asserted by Mr. Swain is that his trial counsel failed to ensure, either by obtaining a severance or by means of an objection lodged during trial, that the jury did not consider Ms. Ballance's admissions in determining his guilt. However, after carefully reviewing the record, we conclude that the admission of Ms. Ballance's statements did not adversely affect Mr. Swain's chances for a more favorable outcome at trial, so that Mr. Swain is not entitled to appellate relief on the basis of the allegedly deficient performance of his trial counsel.

The undisputed evidence clearly establishes that the barrel site was located in an area in which an open season for hunting bear had been established. In his trial testimony, Mr. Swain conceded that he had dumped processed food at the barrel site and that he was with Ms. Ballance when she left at least one deer carcass there. Officer Woods testified that he observed Mr. Swain dumping cookies and other processed food items at the barrel site on 3 November 2008. Mr. Swain admitted at trial that he had been at the barrel site on 3 November and that he dumped corn in the barrels on that occasion. As a result, we conclude that the record contains substantial evidence of Mr. Swain's guilt of placing processed food for use as bait in an area in which there was an open season for hunting bear in violation of N.C. Gen. Stat. § 113-294(r).

In seeking to persuade us to overturn his conviction for taking a bear with the aid of bait in violation of N.C. Gen. Stat. § 113-291.1(b)(2), Mr. Swain argues that, "although [he] admitted that he was present on the 'Ballance Land' on November 11, 2008, he denied being part of [Ms. Ballance's] plan to encourage the child to take a bear." Mr. Swain does not, however, cite to any portion of the transcript in support of this assertion, and we found nothing in the record tending to show that Mr. Swain denied having been involved in Ms. Ballance's plan to make it possible for the child to shoot a bear. At trial, Mr. Swain testified that he and Ms. Ballance went to the barrel site on 10 November 2008 for the purpose of assessing the hunting possibilities that were available at that location and that they returned to the barrel site with Ms. Ballance's son on the following day because "he wanted to go see if he could kill a bear." In addition, Mr. Swain admitted that he and Ms. Ballance stopped about ten yards from the barrels, at "a point where . . . the little boy could sit down and wait and watch" in order

"to see if . . . the bear come to the trail." After a bear appeared approx-
imately ten or fifteen yards from the trail and forty or fifty yards from
the barrels, Ms. Ballance shot at it. At that point, Mr. Swain testified
that he and Mr. Ballance attempted to track it down:

> Q. So the bear walked off. What did you and [Ms.
> Ballance] do and the boy?
>
> A. Well, I got up. We walked to where the bear was
> at . . . . I reckon that's when she called her daddy.
>
>           . . . .
>
> Q. When did you first see [Mr. Ballance] pulling up?
>
> A. As I was putting the dog in the truck.
>
>           . . . .
>
> A. From that point, we . . . took [Mr. Ballance's] dog, went
> back into the woods . . . . [A]nd from that point we walked the
> edge of that trying to find something. We didn't ever find nothing,
> and then we walked back to the path where the bear actually
> made its turn and went back in the woods[.]

As a result, given that Mr. Swain's acknowledged conduct amounts to
the "taking" of a bear with the aid of bait, we conclude that the record
contains ample evidence tending to show Mr. Swain's guilt of vio-
lating N.C. Gen. Stat. § 113-291.1(b)(2) separate and apart from Ms.
Ballance's statements to investigating officers.

In his brief, Mr. Swain contends that Ms. Ballance's confession
included the following statements about Mr. Swain and the events of
November 11, 2008:

> (1) When asked if she was with Mr. Swain when he dumped
> food products at the barrel site on the "Ballance Land," she
> replied, "[Y]es, but she wasn't sure" [what type of food items
> were dumped];
>
> (2) She, Mr. Swain, and a juvenile had been hunting at the
> barrel site where they were located by the officers that day;
>
> (3) Her "intention" was for the child accompanying them to
> shoot the bear, but the juvenile couldn't pull the trigger on
> the rifle;
>
> (4) The bear started walking off;

(5) [Mr. Swain] whistled at the bear; and,

(6) [Ms. Ballance] shot at the bear, but didn't know if she had hit it since no blood was found.

After carefully reviewing the record, we conclude that the only information contained in Ms. Ballance's statements that did not appear in Mr. Swain's trial testimony was her claim that the bear "started walking off" after the shot was fired, that Mr. Swain whistled at the bear, and that Ms. Ballance did not know whether the shot she had fired hit the bear. The fact that the bear "started walking off" and that Ms. Ballance did not know whether she had hit the bear do not incriminate Mr. Swain. In addition, the fact that Mr. Swain may have "whistled at the bear" does not have much significance given his admission that he had attempted to track the bear after Ms. Ballance shot at it. As a result, the admission of Ms. Ballance's statements had little, if any, impact on the jury's decision to convict Mr. Swain of either placing processed food for use as bait in an area in which an open season for hunting bear had been declared or taking a bear with the use of bait, precluding Mr. Swain from making the showing of prejudice needed to obtain relief on ineffective assistance of counsel grounds.

## 2. Suppression Motion

[6] Secondly, Mr. Swain contends that the trial court erred by denying Defendants' motion to suppress evidence seized by the wildlife officers on the Ballance land. Earlier in this opinion, we held that the investigating officers could properly testify concerning the observations that they made while on Mr. Ballance's property and that any error that the trial court may have made by admitting photographs, videotapes, and physical evidence that they seized on Mr. Ballance's property was harmless beyond a reasonable doubt. Similarly, given the fact that Mr. Swain admitted having placed foodstuffs, including processed food products, at the barrel site; to having been with Ms. Ballance when she dumped a deer carcass at the site; and to having helped to track a bear at the barrel site after Ms. Ballance shot at it and given Officer Woods' testimony that he observed Mr. Swain placing processed food items at the barrel site during the weeks before bear hunting season opened, we cannot conclude that the admission of photographs, videotapes, and processed food items seized on Mr. Ballance's property had any material effect on the outcome of Mr. Swain's trial. As a result, Mr. Swain is not entitled to relief on the basis of his challenge to the denial of his suppression motion.

## III. Conclusion

Thus, for the reasons discussed above, we conclude that none of Defendant's challenges to the trial court's judgments have merit. As a result, the trial court's judgments should, and hereby do, remain undisturbed.

NO ERROR.

Chief Judge MARTIN and Judge STOUD concur.